```
IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF ILLINOIS
               EASTERN DIVISION
```

| | | |
|---|---|---|
| ALECKS NIKOLICH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 7395 |
| | ) | |
| THE VILLAGE OF ARLINGTON HEIGHTS, ILLINOIS, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs C.S., Aleks Nikolich ("Aleks"), Dejan Nikolich ("Dejan"), North/Northwest Suburban Task Force on Supportive Housing for Individuals with Mental Illness ("Task Force"), Thresholds, Inc. ("Thresholds"), DDG Boeger, LP ("DDG") and Daveri Development Group, LLC ("Daveri") have sued the Village of Arlington Heights, Illinois ("Arlington Heights"), advancing three theories of recovery:

1. Count I asserts a violation of the Fair Housing Act ("FHA") on behalf of all the plaintiffs,

2. Count II charges a violation of the Americans with Disabilities Act ("ADA") as to C.S.

3. Count III claims a violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") as to C.S.

All three counts stem from Arlington Heights' denial of Daveri's application to permit the construction of a 30-unit apartment facility ("Boeger Place") to house individuals suffering from mental illnesses.

Arlington Heights has filed a motion for summary judgment under Fed. R. Civ. P. ("Rule") 56, and the parties have proceeded in accordance with this District Court's LR 56.1.[1] For the reasons stated here, the motion is granted in its entirety.

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).[2] For that purpose courts consider the entire evidentiary record and must view all of the evidence and draw all inferences from that evidence in the light most favorable to nonmovants (Egan Marine Corp. v. Great Am. Ins. Co. of N.Y., 665 F.3d 800, 811 (7th Cir. 2011)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (Carmichael v. Vill. of Palatine, 605 F.3d 451, 460 (7th Cir. 2010), quoting Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)). As Payne v. Pauley, 337 F.3d 767, 772-73 (7th Cir. 2003) has explained:

> [T]he Federal Rules of Civil procedure require the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Conclusory allegations, unsupported by specific facts, will not suffice.[3]

---

[1] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Arlington Heights' LR 56.1 statement as "A. St. ¶--," to plaintiffs' LR 56.1 statement as "P. St. ¶--" and to the parties' respective responses as "A. Resp. ¶--" and "P. Resp. ¶--." Where a response does not provide a version of the facts different from the original statement, this opinion cites only that original statement. Citations to Arlington Heights' and plaintiffs' memoranda take the forms "A. Mem. --" and "P. Mem. --" respectively, and citations to Arlington Heights' reply memorandum take the form "A. R. Mem. --."

[2] At the summary judgment stage, of course, nonmovant plaintiffs need not "establish" or "show" or "prove" anything, but must merely demonstrate that a genuine issue of material fact exists. This opinion's later employment of those quoted terms is due to the cited cases' use of that terminology, but this Court imposes on plaintiffs the lesser burden described earlier in this footnote.

[3] [Footnote by this Court] Lawyers (and regrettably judges) often lump "self-serving affidavits" into the category of submissions that are insufficient to overcome summary judgment.
(continued...)

Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is a summary of the relevant facts, viewed of course in the light most favorable to nonmovant plaintiffs.

### Factual Background[4]

C.S. is an adult who resides in Park Ridge, Illinois with her parents (A. St. ¶1). She suffers from acute anxiety and schizoaffective disorder and cannot live independently (id.). Aleks and Dejan are co-owners of a parcel of land at issue in this case, located at 120-22 Boeger Road in Arlington Heights (id. ¶2). Task Force is an Illinois not-for-profit corporation that selected Daveri, a for-profit company, to develop 12 to 30 permanent supportive housing apartments in the northwest suburbs (id. ¶¶3, 6). Thresholds is an Illinois not-for-profit corporation that provides services for individuals with mental disabilities and that planned to provide services at Boeger Place (id. ¶4). DDG is an Illinois limited partnership formed to be the parent of developer Daveri and an

---

[3](...continued)
That blanket assertion is incorrect. Payne, 337 F.3d at 773 was careful to distinguish conclusory affidavits from merely self-serving ones:

> We hope this discussion lays to rest the misconception that evidence presented in a "self-serving" affidavit is never sufficient to thwart a summary judgment motion. Provided that the evidence meets the usual requirements for evidence presented on summary judgment -- including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial -- a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts.

[4] In response to some statements of fact by Arlington Heights, plaintiffs object and announce that the facts are in dispute but cite nothing to dispute them as required by LR 56.1(b)(3)(B). Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) teaches that "when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion." Accordingly this Court will treat any improperly disputed facts as having been admitted. Likewise, this Court will not credit facts asserted by any party where the cited portion of the record does not support the asserted fact.

investor in Boeger Place (id. ¶5). Daveri and Thresholds are managing partners of DDG (P. Resp. ¶6).

In 1991 Arlington Heights amended its zoning code to permit group homes for up to eight mentally disabled residents (A. St. ¶10). According to the market study commissioned by Daveri, Arlington Heights had 13 housing units for mentally ill individuals as of January 2010 with another 13 units designed to house 19 people planned for the near future (P. Resp. Ex. 15 at 27). Arlington Heights maintains a Commission For Citizens With Disabilities and employs a full-time Disability Services Coordinator to assist the disabled (A. St. ¶11). Based on national statistics, Arlington Heights' 5 Year Consolidated Plan for 2010-2014 identifies an unmet estimated need for up to 180 housing units for individuals with mental disabilities (id. ¶12).

Boeger Place was to be permanent supportive housing, which is defined by Daveri as "the combination of permanent affordable housing with onsite social services for people with disabilities" (P. Resp. ¶13). Arlington Heights has no zoning restrictions specific to permanent supportive housing or limiting where individuals with mental disabilities may live (A. St. ¶14).

On December 21, 2009 Daveri submitted to Arlington Heights a conceptual proposal for Boeger Place, which was to be a three-story permanent supportive housing apartment building with 30 housing units and 15 parking spaces on a .93 acre plot of land (A. St. ¶15). On January 8, 2010[5] Arlington Heights advised Daveri that the proposed development would require approval by the Village Board of eight amendments or variances from Arlington Heights' zoning code (id. ¶16). Daveri initially planned to apply for a change in zoning from B-1/B-2 (business) to R-6 (multi-family residential), but Arlington Heights advised Daveri that because Boeger Place would include business operations to provide on-site counseling and related services, I (institutional) zoning was the most accurate classification (P. St. ¶2; A. Resp. ¶2). Daveri accepted that advice (id.).

---

[5] All dates referred to hereafter also occurred in 2010 unless otherwise noted.

- 4 -

On February 1 Daveri entered into a contract to purchase the proposed development site from Aleks and Dejan contingent upon (a) Daveri's due diligence, (b) Arlington Heights' approval of certain requested zoning variances and (c) Daveri's financing for Boeger Place (id. ¶17). Daveri filed an application for Boeger Place with Arlington Heights on February 26 that ultimately sought nine amendments or variances from the zoning code, including (A. St. ¶18, Ex. 10 ¶8; P. Resp. ¶18):

1. a variance to reduce the minimum lot size required for 30 housing units from 73,800 square feet to the 40,451 square feet available on the proposed lot for Boeger Place, which would otherwise accommodate only 16 units;

2. a variance to reduce the minimum required parking spaces from 60 to 15, with the possibility of constructing 9 additional spaces sometime in the future;

3. a variance to reduce the minimum unit size by 10% -- from 550 to 495 square feet for studio units and 650 to 585 square feet for one-bedroom units;[6]

4. rezoning of the lot from B-1/B-2 to I, as recommended by Arlington Heights;

5. an amendment to Arlington Heights' Comprehensive Plan; and

6. a variance to reduce the minimum zoning district size.

Arlington Heights adopted its current zoning code in 1985 and has never approved a residential project with 87.5% more than the maximum unit density, the requested degree of reduced parking spaces or a 10% reduction in the square footage per unit required under the 1985 zoning code (A. St. ¶19). It did approve a variation for a 35% increase to the maximum permitted density in a nearby residential development called Timber Court (P. St. ¶5). Plaintiffs submitted a parking study to Arlington Heights in support of the requested reduction in the minimum number of parking spaces (id. ¶6).

---

[6] Another variance to permit a reduction in minimum square footage would also have been required if Boeger Place were to be classified as R-6, as Daveri originally planned (P. Resp. Ex. 3 at 7).

On April 16 Arlington Heights' Planning Department submitted to its Plan Commission a detailed analysis of Daveri's application for Boeger Place, noting that (a) the property is encircled by commercially zoned lots; (b) public transportation to the property is limited; (c) the unit density is almost twice what Arlington Heights' zoning ordinances permit; (d) the proposed unit size is less than permitted by zoning ordinances and (e) the parking is far less than required for either an institutional or residential development (A. St. ¶20). Despite those issues the Planning Department described the property as "adequate for an affordable residential development" and was in favor of the Plan Commission recommending the application because it met Arlington Heights' goal of encouraging housing for people with disabilities, among other things (id.; P. Resp. ¶20). Additionally the Planning Department stated that "the size of the property is sufficient to accommodate the scope of the project" and that Boeger Place "will not have an adverse traffic impact" and "complies with all applicable accessibility, building, health, and life safety code requirements" (id.). On April 21 the Plan Commission voted 4 to 3 in favor of recommending that the Village Board approve Daveri's application (A. St. ¶22). Trustees on the Village Board typically rely on the Plan Commission "very heavily" (P. St. ¶36).

On May 17 the Village Board conducted a public meeting for over five hours, much of which was devoted to discussion of Boeger Place, and it ultimately voted 4 to 3 against approval of the application "as presented this evening" (A. St. ¶23). Each trustee voting against the application gave a zoning-related reason for his negative vote, including density concerns, lack of public transportation and the large number and degree of variances sought (id. ¶24). Trustees also mentioned concerns about proximity to schools, staffing levels, Daveri's alleged failure to reach out to the community and possible issues with Daveri, and Threshold's financial reserves (P. Resp. ¶24).

Numerous residents of Arlington Heights spoke at the meeting, both for and against Boeger Place (P. Resp. Ex. 10 at 25-30). Those against the development mentioned, among other things,

concerns about unit density, safety of children in the community, the fact that Boeger Place would be next door to a day care facility and across the street from Buffalo Grove High School, possible declines in the value of nearby homes and allegedly inadequate notification of parents with children in nearby schools (id.).

After the vote against Boeger Place, Daveri indicated it would amend and resubmit its application but did not do so (A. St. ¶25). Daveri did request information about reapplication on July 21 and was in communication with Arlington Heights representatives until sometime in the fall, at which point Daveri contends it determined that it could not adequately address Arlington Heights' concerns (P. St. ¶¶38-39).

There is no evidence that high-density living, limited parking or small unit sizes help mentally ill people deal with their disabilities (A. St. ¶26).[7] Under either I or R-6 zoning, up to 16 units of permanent supportive housing could have been built at Boeger Place without requiring any variation to zoning density ordinances (id. ¶27). No variations would have been necessary for Thresholds to provide services to a 16-unit development at Boeger Place (id.).

Daveri planned to fund Boeger Place largely through receiving $9.2 million in low income housing tax credits from the Illinois Housing Development Authority ("Housing Authority") and then selling those credits for approximately $5.8 million (A. St. ¶28). That Daveri would not have been able to obtain financing for a 16-unit development or that providing rehabilitative services for a building that size would have been "cost prohibitive" for Thresholds (P Resp. ¶27) does not alter the undisputed facts in the preceding paragraph. If Daveri charged more rent than it had planned, a 16-unit development could support a full-time manager and service spaces, albeit at a less affordable price for tenants (A. St. ¶29). No evidence suggests that the variances from Arlington

---

[7] Although Daveri's representative testified that many people with disabilities prefer to live around other disabled people (P. Resp. ¶26), that preference does not suggest that living around other disabled people is helpful in managing a disability or that high-density living is more helpful (or even preferable) to low-density living that includes some disabled residents.

- 7 -

Heights' zoning ordinances were sought for any reason other than to create affordable housing, rather than ameliorating prospective tenants' disabilities (id. ¶31; P. Resp. ¶31).

Daveri no longer has a contract to purchase the Boeger Place property, any investors for the project, agreements to go forward with the project or funds or tax credits from the Housing Authority that were part of its original financing plan (A. St. ¶¶35-38). Although there are no funds currently dedicated to the project, funds remain available through the Housing Authority and other programs (P. Resp. ¶38).

**Disability-Based Discrimination in Housing**

Under the FHA it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap" (42 U.S.C. §3604(f)(1)). Discrimination includes refusing to make reasonable accommodations necessary to afford a disabled person equal opportunity to use or enjoy a dwelling (id. §3604(f)(3)(B)). Plaintiffs' Complaint alleges that Arlington Heights' rejection of Daveri's application to build Boeger Place evidenced three types of discrimination actionable under the FHA: disparate treatment, disparate impact and failure to accommodate. Counts II and III allege the same types of discrimination under the ADA and Rehabilitation Act, respectively. Because the same analysis applies to plaintiffs' theory of recovery under all three counts, this opinion will address all three counts together.

**Disparate Treatment**

Disparate treatment involves a showing of intentional discrimination, provable via either direct or circumstantial evidence (Kormoczy v. Sec'y, U.S. Dep't of Housing and Urban Dev., 53 F.3d 821, 823-24 (7th Cir. 1995)). Where a plaintiff shows direct evidence of intentional discrimination on the basis of a protected characteristic -- being treated differently because of being handicapped -- defendant must then prove by a preponderance of the evidence that it would have

made the same decision absent the impermissible factor (id.).  Plaintiffs here purport to proceed under the direct method, but their argument is doomed for two reasons.

First, the purported "direct evidence" of discrimination based on the disabled status of prospective Boeger Place tenants is insufficient, to put it mildly.  Plaintiffs point first to "the fact that the only residential housing within [Arlington Heights] zoned Institutional ("I") is housing for persons 55 and older and offers skilled nursing care" (P. Mem. 3).  That is really irrelevant -- it certainly does not demonstrate that the denial of the Boeger Place application was motivated by bias against the mentally handicapped.  Arlington Heights advised Daveri that the provision of on-site therapeutic services by Thresholds made Boeger Place institutional housing, and Daveri accordingly applied for I zoning (P. St. ¶2; A. Resp. ¶2).  Nothing about that suggests ill intent or improper assumptions about the mentally ill on the part of Arlington Heights, nor would applying for R-6 zoning – as Daveri originally planned to do – have changed the fact that Boeger Place would require numerous deviations from zoning ordinances, including variances from the maximum unit density and minimum parking spaces greater than anything previously granted.

Next plaintiffs argue that Arlington Heights' supposed ill intent is evidenced by their "unreasonable" zoning ordinances (P. Mem. 3-4).  But the ordinances concerning unit size, minimum parking spaces and maximum unit density were not imposed solely on Boeger Place, have nothing to do with the type of proposed tenants and are not facially unreasonable or unrelated to legitimate governmental interests.  To the extent plaintiffs are arguing that the Village Board voted against Boeger Place based on zoning ordinances, that really undercuts any suggestion that they voted based on animus toward the mentally ill.

Long ago Vill. of Euclid v. Ambler Realty Co., 272 U.S. 365, 388 (1926) confirmed the power of governments to "forbid the erection of a building of a particular kind or for a particular use ... by considering it in connection with the circumstances and the locality" and held that the legislative judgment as to zoning restrictions must be allowed to control where the validity of those restrictions

was even "fairly debatable." Surely the validity of the restrictions at issue here far surpasses the level of "fairly debatable." So the reasonableness of applying zoning restrictions to Boeger Place -- just as they would be applied to any other proposed building – is not up for debate.

Finally plaintiffs infer discriminatory intent on the part of the Village Board from the comments of various Arlington Heights residents during the May 17 meeting (P. Mem. 4-6). But the single Seventh Circuit case they cite -- Metro. Hous. Develop. Corp. v. Vill. of Arlington Heights, 558 F.2d 1283, 1292 (7th Cir. 1977) ("Metro. Housing") counsels that "bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis." In any event, residents spoke both in favor of and against Boeger Place, and all four trustees who voted against the application attributed their votes to legitimate zoning concerns having nothing to do with the handicaps of proposed residents.

But plaintiffs' disparate treatment argument also fails for a second and unrelated reason. Even if the plaintiffs could point to direct evidence of intentional discrimination, there is convincing evidence that Arlington Heights would have made the same decision if the proposed Boeger Place residents were not mentally ill. It is undisputed that Arlington Heights has never approved variances from the zoning ordinances of this magnitude for any building project regardless of the characteristics of the tenants (A. St. ¶19).

In short, Arlington Heights cannot be said to have treated Boeger Place differently than any other project involving non-disabled residents because no one has ever been granted zoning variances of this scope. Moreover, there are a number of supportive housing projects already serving mentally ill residents in Arlington Heights, and more are planned for the near future (P. Resp. Ex. 15 at 27), -- facts that buttress the determination that the Village Board is not biased against such projects but rather denied the project at hand for the legitimate zoning reasons identified at the May 17 meeting. Thus plaintiffs' disparate treatment contention is doomed.

**Disparate Impact**

Disparate impact, unlike disparate treatment, does not require that an individual be treated less favorably because of a protected characteristic, but rather calls for proof that a facially neutral policy unjustifiably falls more harshly on a protected group than on others (Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003)). No showing of actual intent to discriminate is required (id.).

Here plaintiffs assert that they may use a disparate impact analysis to contest a particular zoning decision, rather than to attack a facially neutral policy such as Arlington Heights' maximum unit density or minimum parking space ordinances (P. Mem. 6-7). Their one-paragraph argument relies (1) on Judge Easterbrook's concurrence in Wis. Cmty. Servs., Inc. v. City of Milwaukee, 465 F.3d 737, 756 (7th Cir. 2006) ("Wis. Services"), which states that statistical analysis is not necessary for a disparate impact claim, and (2) on the fact that Metro. Housing, 558 F.2d at 1290 was based on a refusal to rezone a specific plot of land.

But Judge Easterbrook's concurrence provides no real support for plaintiffs' position for two reasons. First, Wis. Services was a reasonable accommodation case, and the majority specifically noted that its opinion does "not address, nor do we offer any comment on, the merits of [disparate treatment or disparate impact] claims" (465 F.3d at 753 n. 15). Second, the plaintiff in Wis. Services was challenging a city-wide policy concerning special-use zoning permits that it argued had an unjustifiably large impact on certain protected groups. Whether or not plaintiff was required to use statistical evidence in support of a claim not considered by the court is irrelevant.

Metro. Housing is likewise of no help to plaintiffs, for that case did not address the question whether disparate impact claims must be based on facially neutral policies as opposed to specific zoning decisions. Contrast that with the much more recent decision in Farrell v. Butler Univ., 421 F.3d 609, 617 (7th Cir. 2005), where our Court of Appeals granted summary judgment against Farrell's disparate impact contention because "these allegations are specific to Dr. Farrell" and

therefore it was "too much of a stretch to say that [defendant's] procedures can be characterized as employment practices having a disparate impact on women." In short, Farrell was not attacking a neutral policy applied to everyone, but rather a certain decision specific to her (id.). Other circuits have been even clearer in their rejection of disparate impact approaches that are not based on facially neutral policies, such as in Regional Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 53 (2d Cir. 2002):

> RECAP does not challenge a facially neutral policy or practice; it challenges one specific act: the denial of a special use permit for the Formisano property. No comparison of the act's disparate impact on different groups of people is possible. RECAP therefore fails to allege a cognizable cause of action under a disparate impact theory. . . .

As that opinion makes clear, if plaintiffs could proceed under a disparate impact theory challenging solitary zoning decision nearly every zoning denial would be a source of potential liability. Every denial would by definition impact the group of people applying and not other groups, so that disparate impact on a protected class could always be shown if most of the proposed residents, customers or owners shared some protected characteristic. That was never the intended purpose of the FHA, ADA or Rehabilitation Act. Because plaintiffs here do not contend and cannot demonstrate that Arlington Heights' zoning policies – as opposed to the individualized denial of the Boeger Place application – have a disparate impact on the disabled, their disparate impact theory must also fail.

**Failure To Accommodate**

To prevail on a failure-to-accommodate theory, a plaintiff must show both (1) that the requested accommodation is reasonable, which Wis. Services, 465 F.3d 737, 749 (internal quotation marks omitted) has defined as being "both efficacious and proportional to the costs to implement it" and (2) that the accommodation is "necessary to ameliorate the effect of the plaintiff's disability." In other words, accommodations qualify as necessary only when "the rule in question,

if left unmodified, hurts handicapped people *by reason of their handicap*, rather than ... by virtue of what they have in common with other people, such as a limited amount of money to spend on housing" (id. (emphasis in original, internal quotation marks omitted)). That rule is illustrated in Good Shepherd Manor Found., Inc. v. City of Momence, 323 F.3d 557, 562 (7th Cir. 2003), which rejected a group home's contention that the city could not shut off the water supply to the group home's land. Good Shepherd reasoned that "[c]utting off the water prevents anyone from living in a dwelling, not just handicapped people," and the lack of accommodation argument therefore failed because the residents' disabilities did not deny them an equal opportunity to obtain housing.

Plaintiffs claim that Arlington Heights violated the FHA, ADA and Rehabilitation Act by failing to accommodate them in two ways: denying the variances sought in Daveri's application for Boeger Place and "refusing to engage in the mandated interactive process" (Complaint ¶¶ 61-63). Those claims fail for several reasons.

First, plaintiffs cannot show that the mental illnesses of Boeger Place's prospective tenants was a "but for" cause of their inability to build and reside at Boeger Place. There is no evidence that Arlington Heights would have approved any application requesting such large variances from zoning code with respect to unit density, minimum unit size and minimum parking spaces, regardless of the intended tenants. Paralleling the decision to cut off water services in Good Shepherd, Arlington Heights' zoning ordinances would have prevented anyone from building the type of development proposed by Daveri. Hence plaintiffs' accommodation claim must fail because it was not the proposed tenants' mental illnesses that prevented the building of Boeger Place, but rather the uniformly imposed zoning ordinances.

Second, it is undisputed that none of the variances sought by Daveri would "ameliorate the effect of the plaintiff's disability" as required for an accommodation to qualify as "necessary" (Wis. Services, 465 F.3d 737, 749 (internal quotation marks omitted)). Instead the variances were sought to make the project financially feasible for Daveri and Thresholds (A. St. ¶¶26, 31; P. Resp.

¶31), which our Court of Appeals has repeatedly held does not qualify as a necessary accommodation.

Thus Brandt v. Vill. of Chebanse, 82 F.3d 172, 175 (7th Cir. 1996) held that permission to build multi-unit housing for disabled people capable of independent living in an area zoned for single-family homes was not an accommodation at all -- necessary or otherwise -- because the disabled "could live as easily, if somewhat more expensively, in new or remodeled single-family houses." And Hemisphere Bldg. Co. v. Vill. of Richton Park, 171 F.3d 437, 440 (7th Cir. 1999) rejected variations to create affordable housing even more forcefully:

> To require consideration of handicapped people's financial situation would allow developers of housing for the handicapped to ignore not only the zoning laws, but also a local building code that increased the cost of construction, or for that matter a minimum wage law, or regulations for the safety of construction workers. Anything that makes housing more expensive hurts handicapped people; but it would be absurd to think that the FHAA overrides all local regulation of home construction.

Here as in Brandt, the proposed residents of Boeger Place could live just as easily, albeit more expensively, in a development with fewer units, larger square footage and more available parking. It is undisputed (1) that no zoning variances would have been required for Daveri to build, and for Thresholds to provide on-site services at, such a development and (2) that similar developments already exist in Arlington Heights, with more planned for the near future (A. St. ¶27; P. Resp. Ex. 15 at 27). That Daveri could not have used its proposed financing to build more expensive units, or that Thresholds considered it cost-prohibitive to provide services to a smaller development, does not change the fact that the requested variances from Arlington Heights' zoning code were intended to make the Boeger Place units more affordable and not to address the prospective tenants' disabilities.

Third, Arlington Heights argues that it cannot have violated the FHA, ADA or Rehabilitation Act by failing to engage in an interactive process to identify a reasonable accommodation because no such process is required of municipalities. No party has unearthed any caselaw on this topic

within this Circuit, nor has this Court been able to find any such authority. But, Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustments, 284 F.3d 442, 455 (3d Cir. 2002) addressed exactly this situation and held that even though the interactive process is required in an employer-employee relationship, "it would be particularly inappropriate to impose it on local land use boards because they already face detailed state and municipal requirements mandating formal procedures" and are often subject to state law limitations on "informal, off-the-record negotiations with variance applicants."[8]

In response, plaintiffs point to pages 3 and 7 of a 2004 Joint Statement of the Department of Housing and Urban Development and the Department of Justice entitled "Reasonable Accommodations Under the Fair Housing Act" (P. Resp. Ex. 38). Although the Joint Statement states that a "housing provider" should discuss "whether there is an alternative accommodation that would effectively address the requester's disability-related needs," it says nothing about imposing such a duty on municipalities and does not address the Lapid-Laurel concerns that such a procedure would compromise the policies underlying restrictions on informal contact between developers and board members, such as limiting the potential for corruption of local officials (284 F.3d 442, 456 n.7). Once again, the variances sought by plaintiffs were indisputably not related to anyone's "disability-related needs" but were rather aimed to make Boeger Place more affordable and to enable Daveri to obtain financing for the project (A. St. ¶¶26, 31; P. Resp. ¶31).[9] As with their other contentions, plaintiffs' reasonable accommodation theory must fail.

---

[8] Arlington Heights' Village Board is subject to such restrictions under the Open Meetings Act, 5 ILCS 120/1 et seq.

[9] Plaintiffs also correctly observe that Brandt and Hemisphere mention in passing that the defendant municipalities there offered alternative building sites or zoning designations (Brandt, 82 F.3d at 173; Hemisphere, 171 F.3d at 439). That, however, does not mean they were required to do so. Neither case addressed whether any interactive process was necessary.

**Conclusion**

With no genuine issue of material fact having been identified, Arlington Heights is entitled to a judgment as a matter of law. Its Rule 56 motion is therefore granted in its entirety, and this action is dismissed with prejudice.[10]

_____
Milton I. Shadur
Senior United States District Judge

Date: June 20, 2012

---

[10] Because what has gone before has dispatched all of plaintiffs' theories of recovery, this opinion need not -- and does not -- reach the issues of (1) whether the Zoning Enabling Act bars some or all of the Complaint or (2) whether the action is moot as to some or all of the plaintiffs.